**Ross P. Meyer (028473)**
Ross@EnaraLaw.com
**Enara Law PLLC**
7631 East Greenway Road, Suite B-2
Scottsdale, Arizona 85260
Telephone: (602) 687-2010
Filings@EnaraLaw.com
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Haute Plank, Inc., an Arizona corporation, | Case No.: 2:25-cv-04436-JZB |
| Plaintiff, | **MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF A PRELIMINARY INJUNCTION** |
| vs. | |
| Grato, S.L., LLC, a Spanish corporation, | |
| Defendant. | |

Plaintiff, Haute Plank, Inc., by and through Counsel, hereby submits this Memorandum of Law in Support of Entry of Preliminary Injunction for the Court's consideration, filed in support of Plaintiff's Application and requested relief. The Application for Preliminary Injunction and Declaration of Plaintiff is filed contemporaneously with this Memorandum. Plaintiff incorporates the Complaint filed in the above cause of action and all other pleadings filed in support of Plaintiff. Each paragraph and fact are incorporated in support of every section below.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    THE NEED FOR INJUNCTIVE RELIEF

Defendant Grato, S.L., LLC ("Defendant" or "Grato"), is a Spanish corporation that just recently, on February 14, 2025, registered to do business in Arizona. *See* Foreign Registration Statement, Arizona Corporation Commission Records, Grato, S.L., LLC (Feb. 14, 2025), attached as **Exhibit 1**. Grato has been Plaintiff Haute Plank, Inc.'s ("Plaintiff"

1

or "Haute Plank") supplier of high-end luxury flooring since 2024. *See* Declaration of Jennifer Alvarez, at ¶ 3 (Dec. 11, 2025), attached as **Exhibit 2**. A payment dispute arose between the Parties beginning in or around early 2025, which led to Grato refusing to ship Plaintiff's orders. *See* Ex. 2, at ¶ 5. The parties resolved the payment dispute by entering into the August 7, 2025, Agreement, which required Plaintiff to make payments to Grato in excess of $1,200,000, and required Plaintiff to pay fifty (50%) percent of the order price upon placing new orders. *See* Ex. 2, at ¶¶ 9-10; *see also* Agreement, at 2 (Aug. 7, 2025), attached as **Exhibit 3**. After entering into the Agreement, Haute Plank requested that Grato begin shipping the pre-August 7, 2025, Orders, so Plaintiff's customers could receive their high-end luxury flooring that had been previously ordered and in dispute. *See* Ex. 2, at ¶ 11.

Grato has refused and instead has asserted that Plaintiff must pay the $1,200,000.00 prior to any shipment, despite no contract terms supporting Grato's position. *See* Ex. 2, at ¶ 14. Such a proposition does not make sense, as there would be no reason for Plaintiff to enter into the Agreement if its customers' orders were not shipped in a timely manner. Instead, Grato, now without basis, and in contradiction to its own statements, Grato takes the position that the Agreement contemplates shipments not occurring for the pre-August 7, 2025, Orders for another two years. Grato's blatant breach of contract and breach of the implied covenant of good faith and fair dealing, is causing direct impact to Plaintiff's business and Plaintiff's customers. *See* Ex. 2, at ¶ 19. Specifically, Plaintiff is unable to fulfill its previous orders from its customers, and Plaintiff's customers are unable to complete remodeling and other construction projects, both in the Phoenix Metropolitan area and throughout the United States. *See* Ex. 2, at ¶ 20. Plaintiff's customers are now threatening lawsuits and other legal actions, which threaten Plaintiff's viability. Without a preliminary injunction requiring Grato to comply with the Agreement, act in good faith,

and stop interfering with Plaintiff's customer relationships, Haute Plank is unsure how it can survive the imminent barrage of customer cancellations and threatened lawsuits. *See* Ex. 2, at ¶ 23. Plaintiff respectfully requests the Court enter an injunction requiring Grato to comply with the terms of the Agreement, immediately, and ship the pre-August 7, 2025 orders to Haute Plank in Scottsdale, Arizona. Plaintiff further requests that until Grato has provided notice and proof to the Court that it has shipped each of the pre-August 7, 2025 orders, Plaintiff is not required to make the December 15, 2025 payment to Grato. Instead, Plaintiff proposes either: (1) making payment to the Clerk of Court to be held until Grato complies with the Agreement; or (2) entering an order that Haute Plank's payment under the Agreement are not due until thirty (30) days after Grato files its notice and proof to the Court that it has shipped each of the pre-August 7, 2025 orders.

## II.    FACTUAL BACKGROUND

Haute Plank, Inc. is an Arizona corporation incorporated on or around November 22, 2022. *See* Articles of Incorporation, Arizona Corporation Commission Records, Haute Plank, Inc. (Nov. 22, 2022), attached as **Exhibit 4**. Jennifer Alvarez ("Mrs. Alvarez") is the incorporator and director of Haute Plank, Inc. *See* Ex. 4. Haute Plank is a luxury flooring company based in Scottsdale, Arizona. *See* Ex. 2, at ¶ 2.

Defendant Grato is Plaintiff's exclusive supplier of hardwood and is headquartered in Cantabria, Spain, but was registered to do business in Arizona on or around February 14, 2025. *See* Ex. 1; *see also* Ex. 2, at ¶¶ 3-4. During their business relationship, Plaintiff fell behind on payments owed to Defendant Grato, which led to a disruption in Plaintiff's business because Defendant Grato would not ship Plaintiff's orders until the parties agreed on how to remedy the past due amounts. *See* Ex. 2, at ¶ 6. Defendant Grato and Plaintiff Haute Plank communicated often, typically through email and text messages, to resolve the major issue—the mechanism by which Defendant Grato would be paid. In these

communications, Defendant Grato was often hostile, including making threats to take over Plaintiff's business. *See* Ex. 2, at ¶¶ 7-8.

Eventually the parties were able to enter into the August 7, 2025, Agreement (the "Agreement"). *See* Ex. 3. The Agreement states, "Haute Plank, Inc. acknowledges a commercial debt to Grato, S.L. in the amount of $1,208,938.30 USD relating to previously delivered hardwood flooring materials and materials currently ordered and awaiting payment before shipping." *See* Ex. 3, at § 1. The payment of $1,208,938.30, is scheduled to be paid, in accordance with the schedule appended to the Agreement, which includes eight (8) payments ("Payment Schedule"), as follows:

| | |
|---|---|
| December 15, 2025: | $100,000 |
| March 15, 2026: | $110,000 |
| June 15, 2026: | $120,000 |
| September 15, 2026: | $250,000 |
| December 15, 2026: | $130,000 |
| March 15, 2027: | $140,000 |
| June 15, 2027: | $150,000 |
| September 15, 2027: | $208,938.30 |

*See* Ex. 3, at Ex. A. Haute Plank is current with each of these payments and expects to remain current. *See* Ex. 2, at ¶¶ 14-15. Plaintiff is concerned that it will make the first payment and then Grato will not ship its customers' orders. If Grato will not ship the orders it is required to ship under the Agreement, it would be better for Plaintiff and Plaintiff's customers to utilize these payments for refunds to customers and litigate the remaining damage. Based upon the terms and understanding of the Agreement, as long as Haute Plank was current with the Payment Schedule, all "materials <u>currently</u> ordered and awaiting payment before shipping" would be shipped. *See* Ex. 2, at ¶ 16; *see also* Ex. 3, at § 1. Any other interpretation, such as to indicate that the Payment Schedule must be completed, which is not scheduled to be completed until September 15, 2027, prior to shipment of the "materials currently ordered," would render the Agreement superfluous and not solve

4

Haute Plank's major problem – its customers were awaiting shipment of their materials. *See* Ex. 2, at ¶ XX. A small sample of the orders that were confirmed, but not received regarding the pre-August 7, 2025, orders consist of the following confirmed orders by Grato[1]:

| Purchase Order: | [1791] | Confirmed by Grato: | [12/25/24]; |
| Purchase Order: | [1830] | Confirmed by Grato: | [03/26/25]; |
| Purchase Order: | [1838] | Confirmed by Grato: | [07/24/25]; |
| Purchase Order: | [1809] | Confirmed by Grato: | [07/24/25]; |

(the "Pre-August 7, 2025 Orders"). *See* Exhibit 2, at ¶ 13; *see also* Ex. 9, at 7 (Sept. 8, 2025). Plaintiff intends to introduce evidence of all the Pre-August 7, 2025 Orders before the Court, as there are more orders that make up the pre-August 7, 2025 Orders.

The Agreement also provided for how *new* orders would be placed, paid for, and shipped. *See* Ex. 3, at § 6. Specifically, the Agreement provides:

Additionally, while amounts remain due and owing under this payment plan Agreement, [Haute Plank] covenants and agrees:

. . .

d. For new orders placed on and after the date of this Agreement, [Haute Plank] will pay a deposit to [Grato] in the amount of fifty percent (50%) of the order (including shipping), and will pay the balance prior to [Grato] shipping the applicable order.

e. [Grato] will be priority supplier of materials and inventory for [Haute Plank]'s sales, and [Haute Plank]'s agents and employees will use best efforts to promote and sell [Grato]'s products when proposing materials to customers, including but not limited to featuring Grato products prominently in [Haute Plank]'s showroom.

*See* Ex. 3, at § 6(d)-(e). Haute Plank has placed orders with Grato, after August 7, 2025, and has complied with each of these terms. *See* Ex. 2, at ¶ 18. Recently, Grato has now refused to even comply with these terms related to new orders.

---

[1] The identified orders that have not been fulfilled pursuant to the Agreement is not exhaustive. Plaintiff reserves the right to supplement this list without waiver of claim, title, or interest as disclosure and discovery are ongoing.

After executing the Agreement, Plaintiff believed the Pre-August 7, 2025, Orders would be delivered to Scottsdale, Arizona. *See* Ex. 2, at ¶ 12. That did not occur. Instead, Plaintiff's customers began contacting Haute Plank, demanding refunds and immediate delivery, or threatening to sue. *See* Demand Letter from Equilibrium Design Build to Haute Plank (Aug. 18, 2025) (alleging fraud and demanding repayment plus additional damages for failure to deliver the ordered product), attached as **Exhibit 5**; *see also* Demand Letter from Jaburg Wilk to Haute Plank (Sept. 27, 2025) (demanding refund of $52,679.21 or threatening a lawsuit related to claims for breach and misrepresentation), attached as **Exhibit 6**; *see also* Demand Letter from Mark Bronin to Haute Plank (Oct. 15, 2025) (demanding repayment of $62,742.25 and threatening formal complaints and legal action), attached as **Exhibit 7**; *see also* Demand Letter from Tony Gonzales, Esq. to Haute Plank (Oct. 22, 2025) (demanding repayment of $18,705.72 and threatening a lawsuit), attached as **Exhibit 8**.

On or around September 3, 2025, Mrs. Alvarez emailed Grato, stating, "I'm sorry, I think I may have misunderstood. As outlined in Section 1 of the signed Agreement, the acknowledged balance of $1,208,938.30 includes 'delivered materials and materials currently ordered and awaiting shipment.' That was my clear understanding when signing. This means the backlog Pos placed before the Agreement – including [Certain Purchase Orders are Referenced] . . . are covered under the repayment plan in Exhibit A, without requiring new deposits or separate balance payments." *See* Emails between Plaintiff and Defendant, at 9 (Sept. 3, 2025), attached as **Exhibit 9**. Defendant Grato then forwarded this email to their counsel, and states, "Roger, Probably you should have retained your congratulation message a bit. Jennyfer (sic) now claims that **<u>all</u>** orders placed before the signed agreement date should be included in the acknowledged balance of 1,208,938.30. For us, it is evident that the materials currently ordered and awaiting payment before

6

shipping are the ones that make up for the acknowledged balance: including orders that have been produced and invoiced since June, and that are part of said balance. (See highlighted in red on the last page of the receivables report; total agreed highlighted in yellow)[.] Let's discuss this asap." *See* Ex. 9, at 9 (Sept. 3, 2025) (emphasis in original).

Defendant Grato's counsel then states, "Ok, the first question I have is when were the orders she references placed?" *See* Ex. 9, at 8 (Sept. 3, 2025). Defendant Grato responds and states, "The orders she refers to were RECEIVED before the agreement was signed. An order is PLACED and queued into production once the deposit is received and the Order is confirmed." *See* Ex. 9, at 8 (Sept. 4, 2025). Defendant Grato's counsel then follows this up and states, "Ok, let me re-phrase then, were any of the disputed order (sic) received prior to August 7?" *See* Ex. 9, at 2 (Sept. 4, 2025). Defendant Grato then responds to their counsel seeking to amend the Agreement *after* the Agreement was signed, stating "Roger, **i** (sic) **think we should add that all orders with the deposit paid before the date of August 7th, he had a lot of orders but we did not receive the deposit for them**. I think this is fair, what we got the deposits we will have it in the old account, orders without a deposit will not be in the deal." *See* Ex. 9, at 1 (Sept. 4, 2025) (emphasis added). Defendant Grato then forwarded these communications to Plaintiff on September 8, 2025. *See* Ex. 9, at 1 (Sept. 8, 2025).[2]

Sam Alvarez, Mrs. Alvarez's husband, emailed Defendant Grato responding and explaining certain aspects that may have led to any confusion, and stating, if:

---

[2] Plaintiff asserts that Grato has waived its entire attorney-client privilege by intentionally forwarding these privileged communications to Plaintiff. In discovery and for the hearing, Plaintiff requests all communications between Grato and its counsel be turned over for inspection, so as not to be used as a sword and a shield. *See Ulibarri v. Superior Court*, 184 Ariz. 382, 385 (Ariz. App. 1995) (explaining that attorney-client communications are privileged unless the privilege has been waived); *see also State v. Sucharew*, 205 Ariz. 16, 21-22, ¶¶ 10-11 (Ariz. App. 2003) (explaining the attorney-client privilege and that a client waives the privilege by disclosing the confidential communications to a third party).

this means that the total agreement amount needs to be amended, then so be it. Because of how the agreement was written, it should've been included in the total agreement payback amount to begin with. We are happy to add this additional amount to the first two or three payments to not have to redo the entire payment structure. That way GRATO is not waiting the full term to collect those monies. Although, I don't understand why this was not included in the agreement to begin with and reflected in the total repayment amount. Bottom line we just need to get the orders processed and delivered to the clients. We've been going back-and-forth on the agreement for eight months. We finally have one so let's just make it happen if we need to change the number we need to change the number, but based on how that was written, those orders should have been included.

*See* Ex. 9, at 7 (Sept. 8, 2025).

Despite this, Defendant Grato has still failed to comply with the terms of the Agreement, the parties have not amended the Agreement, and Defendant Grato has failed to ship the orders that were received prior to August 7, 2025. *See* Ex. 2, at ¶ 25. Further, Plaintiff hired undersigned counsel, who was also unable to work out any solution with Defendant Grato. As such, Plaintiff respectfully requests that this Court enter an injunction ordering Defendant Grato to comply with the terms of the Agreement and to ship all orders received prior to August 7, 2025, immediately to Plaintiff in Scottsdale, Arizona.

### III.    LEGAL STANDARD

Obtaining a preliminary injunction requires Haute Plank to show this Court that: (1) it is likely to succeed on the merits; (2) the harm suffered is irreparable in the absence of preliminary relief; (3) the balance of hardships between Haute Plank and Grato favors Plaintiff; and (4) an injunction is in the public interest. *Disney Enterprises, Inc. v. Vidangel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### IV.    LEGAL ARGUMENT
**a. Defendant Grato's Admissions and the Terms of the Agreement Show Plaintiff Is Very Likely to Succeed on the Merits.**

**i.  *Grato Breached the Agreement***

8

"To state a cause for breach of contract, the Plaintiff must plead facts alleging '(1) a contract exists between the plaintiff and defendant; (2) the defendant breached the contract; and (3) the breach resulted in damage to plaintiff.'" *Hannibal-Fisher v. Grand Canyon University*, 523 F.Supp.3d 1087, 1093 (D. Ariz. 2021) (quoting *Dylan Consulting Servs. LLC v. Single Care Servs. LLC*, No. CV-16-02984-PHX-GMS, 2018 WL 1510440, at *2 (D. Ariz. Mar. 27, 2018)). Here, there is clearly a contract, the Agreement. *See* Ex. 3. Grato's actions in failing to deliver the materials to Plaintiff have also damaged Plaintiff. *See infra*, at XX-XX. The question is whether the terms of the Agreement meant that Defendant Grato was required to deliver the Pre-August 7, 2025, Orders at the time of the Agreement or when the full Payment Schedule was completed in September 2027. The contract plainly states:

> Haute Plank, Inc. ("Debtor") acknowledges a commercial debt to Grato, S.L. ("Creditor") in the amount of **$1,208,938.30 USD (" (sic) relating to previously delivered hardwood flooring materials and materials currently ordered and awaiting payment before shipping. This debt is acknowledged as a commercial materials obligations and shall not be considered or construed as a loan**.
>
> . . .
>
> Debtor agrees to repay the above amount according to the schedule set forth on Exhibit A to this Agreement.

*See* Ex. 3, at §§ 1-2 (emphasis in original). Here, by including *both* "delivered" and undelivered flooring materials in the direct language of the Agreement, the Parties are treating *all* of it as a past-due commercial obligation, not a future contingent purchase. *See* Ex. 3, at § 1 (". . . relating to previously delivered hardwood flooring materials and materials currently ordered and awaiting payment before shipping."); *see also* A.R.S. § 47-2309(A) ("The time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time."). Further, Defendant

Grato chose to restructure the payment through Exhibit A to the Agreement, rather than proceed with any claims for breach of contract or other forms of relief that may have been available to Defendant. Thus, payment first is no longer tied to the original requirement of "payment before shipping." *See* Ex. 3, at § 1. Further, there is no language contained in the Agreement that states that Defendant Grato will ship *after* payments have been made; there is no contractual language to support Defendant Grato's position. *See* Ex. 3.

"Whether a contract is ambiguous is initially a question of law for the court to decide." *Autonumerics, Inc. v. Bayer Indus., Inc.*, 144 Ariz. 181, 186 (Ariz. App. 1984) (citing *Watson Constr. Co. v. Reppel Steel & Supply Co.*, 123 Ariz. 138 (Ariz. App. 1979)). "Ambiguity is not established by the mere fact that the parties disagree as to the meaning of its terms." *Id*. (citing *Giovanelli v. First Federal Savings and Loan Association*, 120 Ariz. 577 (Ariz. App. 1978)). In *Bayer Industries*, the Arizona Court of Appeals held that the "contract provides for no definite delivery date but anticipates delivery of each control separately over a period of time. This is evidenced by the acknowledgment calling for shipping 'as scheduled' and reference to discounts for units released for shipment within a one-year period." *Id*. Here, there is no such language, and, in fact, language to the contrary.

In addition to the examples provided above, the Agreement specifically identifies what will occur for new orders, stating, "For new orders placed on and after the date of this Agreement, Debtor will pay a deposit to Creditor in the amount of fifty percent (50%) of the order (including shipping), and will pay the balance prior to Creditor shipping the applicable order." *See* Ex. 3, at § 6(d). Here, Exhibit A, the Payment Schedule, *only* applied to the payments and did not indicate or add any delivery conditions. *See* Ex. 3, at Ex. A. Further, by its own language, the Agreement acknowledges that Defendant Grato had "previously delivered hardwood flooring" prior to receiving payment. *See* Ex. 3, at § 1. As

10

such, nothing contained in the Agreement changed this course of dealing, and it was always anticipated that such materials would be delivered once the Agreement was made.

The parties executed a binding Agreement on August 7, 2025, drafted by Defendant's Counsel, providing that the acknowledged balance of $1,208,938.30 includes "delivered materials and materials currently ordered and awaiting shipment," and establishing payment protections for Defendant while entitling Plaintiff to the release of covered backlog orders. *Id*.

Defendants breached the Agreement by withholding covered orders. Despite execution by both parties, Defendants refused to release completed backlog orders, delayed orders, imposed conditional release requirements, and added additional charges (e.g., a 15% "government" tariff, which is not applicable to them because that cost is *only* paid by the exporter, Plaintiff). They also added terms not agreed to in the parties' understanding of Section 1 for pre-August 7, 2025, orders. This directly contradicts the Agreement and constitutes a material breach. This conduct directly violates the Agreement's terms and is causing immediate and irreparable harm to Plaintiff's business operations, financial stability, and both personal and professional reputation. Plaintiff's livelihood is now in severe jeopardy, necessitating urgent judicial intervention.

Defendant's continued and deliberate refusal to adhere to the Agreement profoundly impairs Plaintiffs' ability to perform their contractual obligations to customers, leading to severe reputational harm, significant erosion of goodwill, and a cascade of client disputes and credible legal threats. This pattern of conduct not only supports claims for breach of contract but also forms the basis for various business torts, including tortious interference with prospective economic advantage.

> ### ii.  *Grato Breached the Covenant of Good Faith and Fair Dealing.*

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Two Brothers Distributing Inc. v. Valero Marketing & Supply Co.*, 270 F.Supp.3d 1112, 1128 (D. Ariz. 2017) (quoting *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, ¶ 59 (Ariz. 2002)). "The implied covenant 'prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.'" *Id*. "Thus, Arizona law recognizes that a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms, but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id*. (quoting *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 424, ¶ 14 (Ariz. App. 2002)).

Grato is withholding performance to extract new concessions by refusing to deliver the materials and fulfill the orders unless Plaintiff pays the $1,200,000.00 and additional, un-bargained-for charges. This conduct constitutes a classic example of bad faith, as Grato is leveraging its contractual position not to enforce legitimate rights, but to coerce Plaintiff into accepting new, unfavorable terms that are outside the scope of the original Agreement. For instance, Grato has demanded payment of arbitrary surcharges and imposed shifting, unsupported requirements for shipment, none of which are contemplated by the contract. Such tactics are designed to sabotage and penalize Plaintiff, rather than to resolve any bona fide dispute. The continuous recitation of dubious and shifting reasons to avoid performance or to impose new conditions not found in the contract is a hallmark of bad faith, as recognized by Arizona courts.

Moreover, Grato's failure to cooperate in logistics and to provide reasonable access to materials further demonstrates a lack of good faith and fair dealing. Amending or

introducing new terms to a contract without the parties' mutual consent is not only unjust but also violates the implied covenant of good faith and fair dealing, as recognized in *Two Brothers Distributing Inc. v. Valero Marketing & Supply Co.*, 270 F.Supp.3d 1112, 1128 (D. Ariz. 2017). Such conduct undermines the very purpose of the Agreement and deprives Plaintiff of the benefit of its bargain.

### iii.   *Grato Tortiously Interfered with Haute Plank's Customers*

"Tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's right under a contract with another if the interference causes the plaintiff to lose a right under the contract." *ABCDW LLC v. Banning*, 241 Ariz. 427, 436-37, ¶ 37 (Ariz. App. 2016) (quoting *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 33 (Ariz. 1986)). "A prima facie case of intentional interference with contract requires alleging the following: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferor; (3) intentional interference inducing or causing a breach; (4) resultant damage to the party whose relationship has been disrupted; and (5) that the defendant acted improperly." *Id.*, at 437, ¶ 37.

Defendant accepted confirmations and purchase orders that show valid customer commitments or protectable expectancies with defined quantities, prices, and delivery terms. Defendant generated confirmations *for each project* and executed an agreement acknowledging that materials were awaiting shipment, thereby evidencing actual knowledge of Plaintiffs' client and customer relationships, deadlines and obligations to their customers. Then, Defendant withheld completed orders and imposed new conditions, causing cancellations, refunds, and chargebacks, after the parties entered into an agreement.  These breaches were intentional and meant to do the very opposite of the intended Agreement so that Plaintiff's business, and their relationship and obligations to their customers, would not thrive and continue. The interference was intentional and

13

proximate to the disruptions. Using withholding to impose leverage and alter terms midstream of an agreement is improper and caused damages in the form of lost profits, refunds and chargebacks, extraordinary logistics, reputational harm, and erosion of goodwill.

### b.  Plaintiff Haute Plank is Likely to Suffer Irreparable Harm.

"Irreparable harm is harm for which there is no adequate remedy at law, such as money damages." *See E\*Trade Financial Corp. v. Eaton*, 305 F.Supp.3d 1029, 1036 (D. Ariz. 2018). "Nonetheless, '[t]he threat of being driven out of business is sufficient to establish irreparable harm.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)). "Thus, showing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *Id.* (citing *AM Passage Media Corp*, 750 F.2d at 1474).

In *E\*Trade*, the District Court acknowledged that even though its "substantial loss of business" could be quantified, what could not be quantified is the "loss of follow-on-business, goodwill and reputation flowing from such breach or interference" that cannot be compensated. *Id.* Based upon such a demonstration, the District Court found that E\*Trade had "sufficiently shown that irreparable harm will occur without injunctive relief." *Id.*

Similarly, in *hiQ Labs*, the Ninth Circuit affirmed the District Court's ruling that hiQ had demonstrated a likelihood of irreparable harm absent a preliminary injunction because hiQ had no other way to operate its business model other than through access to "public LinkedIn member profiles," and would therefore be likely to breach its existing contracts with clients such as "eBay, Capital One, and GoDaddy, and to pass up pending deals with prospective clients." 31 F.4th at 1189.

The evidence in the record demonstrates that Haute Plank has suffered, and will continue to suffer, irreparable harm in the form of lost goodwill, damaged reputation, and loss of follow-on business from contractors and customers. Multiple customers have sent demand letters threatening legal action and seeking refunds due to the non-delivery of materials, including customers who are currently threatening lawsuits through their counsel, Jaburg & Wilk, Mark Bronin, and Tony Gonzales, Esq. *See* Exs. 5-8. These customers represent not only current business but also future referrals and repeat projects, which are critical in the construction and remodeling industry. The inability to fulfill these orders has already resulted in canceled contracts and the loss of trust among key contractors, who have indicated they will no longer do business with Haute Plank. This loss of goodwill and future business opportunities cannot be adequately compensated by monetary damages alone, as it undermines Haute Plank's reputation in the marketplace and its ability to secure future projects. The harm is ongoing and compounding, as each unfulfilled order further erodes customer confidence and market standing.

### c.  The Balance of Hardships Favors Plaintiff Haute Plank

"When analyzing this element, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Forefront Dermatology S.C. v. Crossman*, 642 F.Supp.3d 947, 954 (D. Ariz. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). "In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

The balance of hardships overwhelmingly favors Plaintiff Haute Plank. Haute Plank is a relatively new, Arizona-based business that relies on timely delivery of high-end

flooring materials to fulfill customer orders and maintain its reputation in a competitive market. The continued withholding of materials by Grato has already resulted in lost contracts, threatened lawsuits, and significant reputational damage, placing Haute Plank at risk of insolvency. In contrast, Grato is a multinational corporation with a longstanding presence in the industry, greater financial resources, and the ability to absorb any temporary inconvenience resulting from compliance with the Agreement. Grato already has the materials produced and ready for shipment, and its refusal to deliver is not based on any inability to perform, but rather on an attempt to extract additional concessions and take over Plaintiff's business.

Granting injunctive relief would simply require Grato to honor its contractual obligations. The relative impact on Grato is minimal compared to the existential threat faced by Haute Plank. Courts have recognized that the risk of a party being driven out of business, as is the case here, constitutes a far greater hardship than any temporary business inconvenience to a larger, more established supplier.

### d. Injunctive Relief Is In the Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Forefront Dermatology*, 642 F.Supp.3d at 955 (citing *Pure Wafer Inc. v. City of Prescott*, 275 F.Supp.3d 1173, 1179 (D. Ariz. 2017)). "The public interest analysis for the issuance of a[n] injunction requires [the court] to consider whether there exists some critical public interest that would be injured by grant of [injunctive] relief." *Id*. "The public interest inquiry primarily addresses impact on non-parties rather than parties." *Id*.

This factor is critical because protecting consumers from harm and enforcing contracts are central to serving the public interest. When suppliers withhold completed orders or impose midstream surcharges or forced air freight, the resulting disruptions

extend far beyond the immediate parties. Such conduct has led to missed project milestones, idle labor, lender draw delays and forced substitutions that compromise both quality and cost efficiency. These adverse effects are documented in demand letters and purchase order notes, and they directly impact not only Haute Plank's customers but also contractors, designers, lenders, and other stakeholders who depend on timely delivery and predictable costs – and homeowners and residents in Arizona and the United States.

The requested relief directly serves the public by protecting Arizona businesses and consumers and stabilizing construction and renovation schedules across the state. When suppliers withhold completed materials or impose unanticipated surcharges or forced air freight, the resulting cascading costs, scheduling failures, and quality compromises inflict direct harm on homeowners, designers, contractors, and the broader community. The cumulative effect is a destabilization of the construction, remodeling market, and housing market here in Arizona and United States, increased financial strain on all participants, and a significant loss of trust in the supply chain. This comprehensive harm clearly satisfies the public interest factor required for injunctive relief. By ordering the release of the completed backlog and prohibiting the imposition of new, unbargained-for conditions, the Court would reduce cancellations and chargebacks, preserve project schedules and labor, and support the integrity and predictability of the marketplace.

## V.    CONCLUSION

Plaintiff Haute Plank respectfully requests the Court enter a Preliminary Injunction ordering Grato to immediately provide confirmation of and to immediately ship the Pre August 7, 2025 Orders to Haute Plank in Scottsdale, Arizona. Plaintiff requests the Court order that until Grato provides notice to the Court that it has shipped the Pre August 7, 2025 Orders, no payment shall be due to Grato under the Agreement. Instead, once Grato provides notice to the Court that it has shipped the Pre August 7, 2025 Orders, Plaintiff

17

will either have thirty (30) days to make payment under the Agreement, or in the alternative Plaintiff will place its payments with the Clerk of Court.

**RESPECTFULLY  SUBMITTED**  this 15th day of December 2025.

**ENARA  LAW  PLLC**

By: */s/ Ross P. Meyer*
Ross P. Meyer, Esq.
*Attorney for Plaintiff*

18

**CERTIFICATE  OF SERVICE**

I hereby certify that on December 15, 2025, a true copy of the foregoing document was filed with the CM/ECF system and will be electronically sent to the counsel for Defendant together with the Complaint and entire docket presently before the Court as identified on the Notice of Electronic Filing, and paper copies will be sent to any non-registered participants.


By: */s/ Leslie Cruz Morales*